# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMUNITY ASSOCIATION UNDERWRITERS OF AMERICA, INC., a/s/o VILLAGE AT CAMELBACK PROPERTY OWNER ASSOCIATION, et al., | CIVIL ACTION NO. 3:10-CV-01559 |
| Plaintiffs, | (MEHALCHICK, M.J.) |
| v. | |
| QUEENSBORO FLOORING CORP., et al., | |
| Defendants. | |

## MEMORANDUM OPINION

This is a consolidated action involving property damage and personal injury claims arising out of a July 2009 explosion and fire that occurred during construction work at a townhouse located in Tannersville, Pennsylvania. Another case, *Pozarlik v. Camelback Associates, Inc.*, No. 3:11-CV-1349, was consolidated into this action on March 15, 2012. (Doc. 31). Plaintiffs Arkadiusz Piotr Pozarlik and Agnieszka Zofia Pozarlik assert tort claims against several defendants, including: the Village at Camelback Property Owners Association, Inc. ("the Association"), and its property manager, Kathleen Simoncic; Queensboro Professional Wood Flooring, LLC ("Queensboro Professional"), and its owner, Tomasz Korytkowski; Queensboro Flooring PA Corp. ("Queensboro PA"); and property owner Bella Chernov.[1] On

---

[1] The Pozarliks also asserted claims against seven John Doe Defendants, all of whom were Ukrainian nationals working at the construction site (the "Ukrainian workers"). However, these John Doe Defendants have not been served and are not involved in the motions presently before the Court. The Ukrainian workers are often identified as Russians in the parties' filings.

March 26, 2012, the Association filed crossclaims against Queensboro Professional and Korytkowski, Queensboro PA, and Chernov. (Doc. 35). Queensboro Professional and Korytkowski also filed a crossclaim, on May 16, 2012, seeking contribution and/or indemnification against co-Defendants the Association and Simoncic, Queensboro PA, and Chernov. (Doc. 38). On July 25, 2012, Queensboro Professional and Korytkowski next filed a third-party complaint seeking contribution and/or indemnification against Dmitry Epelboym, the son of Bella Chernov. (Doc. 45). Queensboro PA then filed its own crossclaims on May 17, 2013, alleging that any harm suffered by the Plaintiffs was due to the negligence of co-Defendants the Association and Simoncic, Queensboro Professional and Korytkowski, Bella Chernov, and third-party Defendant Dmitry Epelboym. (Doc. 91; Doc. 92; Doc. 93). Finally, on June 12, 2015, Chernov filed an amended crossclaim seeking contribution and/or indemnification against Queensboro Professional and Queensboro PA.[2] (Doc. 242).

Presently before the Court are three motions for summary judgment, each filed on June 15, 2015. In the first motion, Chernov seeks summary judgment as to all outstanding claims against her. (Doc. 243). This motion is opposed by Queensboro Professional and Korytkowski (Doc. 258; Doc. 269), Queensboro PA (Doc. 264), the Association and Simonic (Doc. 271), and the Pozarliks (Doc. 276). In the second motion, third-party Defendant Epelboym seeks summary judgment with regard to the claims for indemnity and contribution against him. (Doc. 246). Epelboym's motion is opposed by Queensboro Professional and Korytkowski (Doc. 259;

---

[2] The Court granted Chernov leave to file an amended pleading pursuant to Federal Rule of Civil Procedure 15(c) despite the advanced stage of the litigation process because Chernov mistakenly believed at the time of her initial pleading that Queensboro Professional and Queensboro PA were one and the same entity. (Doc. 235).

Doc. 270), and also by Queensboro PA (Doc. 265). The third motion was filed by the Association and Simoncic (Doc. 247), and is opposed by the Pozarliks (Doc. 277), the only party to assert claims against them. All three motions have been fully briefed, and oral argument was held on September 21, 2015. (Doc. 289). Accordingly, the three motions are now ripe for disposition.

## I. FACTUAL BACKGROUND

The undisputed facts are as follows. Bella Chernov purchased Unit 298 on Overlook Way within the Village at Camelback in Tannersville, Pennsylvania on August 18, 2005. (Doc. 1, at 2; Doc. 243-1, at 6). Chernov purchased the property after viewing it with her son, Dmitry Epelboym, and Epelboym's wife. (Doc. 243-1, at 6). The Village at Camelback is a condominium consisting of individual units that are individually owned and common areas held as undivided interests vested in the unit owners. 68 Pa. Cons. Stat. § 3103. The Association is a non-profit corporation responsible for the care and maintenance of the Village at Camelback's "Common Lands, Common Roads, and the exterior of all Dwelling Units . . . ." (Doc. 248-14, at 7). The Association conducts its affairs pursuant to a Declaration of Protective Covenants and Easements (the "Declaration). (Doc. 248-14, at 35). The Declaration is binding upon and intended for the benefit of all individual unit owners, as well as their heirs, assigns, immediate family, guests, and lessees. (Doc. 248-14, at 6-7, 40).

Although Chernov received the deed for the property at closing, she does not recall personally receiving information about the Association, including its governing Declaration, bylaws, and rules and regulations. (Doc. 243-1, at 8). She understood that the Association took care of routine maintenance around the property, but never enquired as to the extent of the Association's duties. (Doc. 243-1, at 10). Chernov does not recall any occasion where the

Association conducted maintenance work either inside or along the exterior of her home. (Doc. 243-1, at 10). Furthermore, Chernov stated that she had never met Simoncic and was not aware of Simoncic's role as the Association's property manager. (Doc. 243-1, at 13).

Shortly after Chernov purchased the property in 2005, Epelboym began a series of repairs and renovations on Unit 298 that would continue until 2009. (Doc. 243-1, at 13). Chernov gave her son authority to conduct all the renovations, but claims that she did not choose the contractors or pay for any of the repairs directly.[3] (Doc. 243-1, at 11, 13). Chernov initially claimed that she did not apply for any building permits in connection with the repair work, but then later recalled that she signed for the building permits "[b]ecause the house is in [her] name." (Doc. 243-1, at 14). The Declaration also provides that property owners must obtain prior approval from the Association before constructing any buildings, structures or roadways. (Doc. 243-1, at 37). However, the Association generally did not concern itself with any work inside the individual units unless the work threatened to damage the common areas or otherwise looked likely to result in a breach of the covenants. (Doc. 248-8, at 7; Doc. 248-14, at 35). In the event that some condition inside an individual unit threatened to result in a breach of the covenants or otherwise presented a problem, the Association may inspect inside the unit after providing notice. (Doc. 248-14, at 35).

Some of Epelboym's renovation projects included adding a sauna and Jacuzzi to the bathroom and replacing the exterior siding of Unit 298. (Doc. 243-4, at 30-32, 46). Epelboym served as the de facto general contractor for the repair work. (Doc. 243-3, at 4). Epelboym

---

[3] Chernov reimbursed her son for the money he spent on construction expenses. (Doc. 243-2, at 46).

usually hired a handful of Ukrainian workers to perform the labor for these projects. (Doc. 243-4, at 30-31). Epelboym was friends with one of the Ukrainians, Lubamir, who Epelboym would communicate with and tell how many other workers he needed for a given project. (Doc. 243-4, at 46). The Ukrainians were uninsured (Doc. 243-4, at 47-48) and lacked formal training, but had done construction work before and possessed various skills such as plumbing, electrical, and woodworking experience. (Doc. 243-4, at 47-50). Epelboym himself also lacked insurance and formal training. (Doc. 243-4, at 47).

One of the improvement projects that Epelboym decided to take on involved rebuilding the front deck. Chernov had fallen on the old deck twice and noticed that the wood was rotting. (Doc. 243-2, at 42). In a letter dated March 16, 2006, Chernov asked the Association for permission to tear down the old deck attached to the unit and to replace it with a new one, as is required under the Declaration before building any structure on common lands. (Doc. 243-2, at 42). In addition to the deck itself, Chernov requested to add a retaining wall underneath as structural support for the deck and to use as a storage area. (Doc. 243-2, at 31-32, 40-42). It is unclear whether the Association ever formally approved this project. (Doc. 243-1, at 37-38; Doc. 243-2, at 42; Doc. 282-1, at 11). In any event, construction on the deck began in March of 2006 using the same Ukrainian workers that provided the labor for Epelboym's other projects. (Doc. 243-2, at 43; Doc. 243-4, at 30-31).

In July of 2007, John Lewitzky, a member of the Association's board, sent an e-mail to other board members discussing the construction at Unit 298. (Doc. 276-20, at 2). Lewitzky noted that Epelboym had constructed "a concrete block room, on common ground, without Board approval, approximately 15 by 15 feet [and] complete with Anderson windows." (Doc. 276-20, at 2). Lewitzky concluded that the structure appeared to be a 200 square foot extension

off the front bedroom rather than mere storage space. (Doc. 276-20, at 2). The e-mail concluded

with an admonishment of Simoncic and the Association's maintenance staff for failing to notice

the construction work and put a stop to the extension. (Doc. 276-20, at 2-3).

      In response to Lewitzky's e-mail, Simoncic met with Chernov, informed her that the

structure violated the Declaration, and mailed her a cease and desist order in regard to the

construction. (Doc. 276-7, at 10). Despite the cease and desist order, the Association observed

that the construction at Unit 298 continued. (Doc. 276-7, at 14). Early the following month, the

local township also sent Chernov a cease and desist order as well as a notice of violation (Doc.

276-7, at 15), but this too failed to put an end to the construction. (Doc. 276-7, at 16).

Ultimately, the Association filed suit against Chernov on August 27, 2007 in the Court of

Common Pleas for Monroe County. (Doc. 248-2, at 2). Prior to trial, the Court of Common

Pleas judge issued a preliminary injunction on May 16, 2008 enjoining Chernov from violating

the restrictive covenants found in the Declaration. (Doc. 248-2, at 2). Trial was held on

September 25, 2008, and on November 4, 2008 the Court of Common Pleas judge entered an

order requiring Chernov to remove all structural alterations made to Unit 298 and pay the

Association $8,446.33 in attorney's fees. (Doc. 248-2, at 2, 13). Chernov was also permitted to

submit plans for a new deck and training wall to the Association for approval. (Doc. 248-2, at

14). Chernov filed a motion for post-trial relief on November 13, 2008. (Doc. 277-25, at 3). In

its brief in opposition to Chernov's motion for post-trial relief, the Association argued that the

structure needed to be torn down "under any circumstance" because of its "egregious defective

construction," and went on to raise numerous safety concerns with the structure as it was then-

built. (Doc. 277-26, at 5). The Court of Common Pleas judge denied Chernov's motion for post-trial relief in an order filed on January 23, 2009 (Doc. 277-25, at 2).[4]

On May 29, 2009, Chernov submitted a permit application to finally demolish the illegal addition and replace it with a new deck. (277-27, at 2). The demolition work and construction of the replacement deck was done by the same Ukrainian workers once more. (Doc. 243-4, at 37-39). Despite previously calling their work "egregious defective construction" in its brief in opposition to Chernov's motion for post-trial relief (Doc. 277-26, at 5), and having a right under the Declaration to hire its own contractors to do the demolition and construction of the new deck at Chernov's expense (Doc. 248-14, at 24), the Association allowed the same Ukrainian workers to perform the new construction under Epelboym's oversight (Doc. 277, at 31). In fact, Pozarlik alleges that the Association and Simoncic never inspected or provided oversight of the new construction work. (Doc. 277, at 32).

By July of 2009, the new construction work was nearly complete. (Doc. 243-4, at 39-40). On or about July 10, 2009, Epelboym and Chernov flew to Europe for a cruise. (Doc. 243-3, at 5). Before leaving, Epelboym instructed the Ukrainian workers to complete the final touch-ups affiliated with wrapping up the construction work, including painting the deck and stairs and checking the walls for any scratches. (Doc. 243-3, at 7). Epelboym knew that the deck's stairs

---

[4] This dispute is just one of several that Chernov and Epelboym had with the Association. They were cited for a satellite dish on the exterior of Unit 298 and a light fixture on the front deck that did not comply with the Association's rules (Doc. 276-7, at 7-8); received numerous parking citations, which at one point prompted Epelboym to threaten to cut off the legs of the Association's security officer (Doc. 276-7, at 9); damaged the security gate control stanchion with a piece of wood sticking out the passenger window of their car (276-18, at 5); and were issued hundreds of dollars in fines for various violations of the Association's rules (276-18, at 18-19).

were technically on common property and thus the Association's responsibility, but he was unwilling to wait for the Association's maintenance staff to get around to painting them. (Doc. 243-4, at 40, 59-60). Epelboym did not give the Association notice that the Ukrainian workers would be painting the deck and steps on common property while he was abroad. (Doc. 243-4, at 60).

In addition to the touch-ups to be performed by the Ukrainian workers, before leaving the country Epelboym also made arrangements with Tomasz Korytkowski for Queensboro Professional to refinish the floors inside Unit 298. (Doc. 243-4, at 60-61). Korytkowski then visited the property and estimated that the job would cost $2,000. (Doc. 243-4, at 61). Epelboym did not check to see whether Queensboro Professional was insured prior to hiring them. (Doc. 243-4, at 64). Furthermore, Epelboym was mistakenly under the impression that Korytkowski's Queensboro Professional was the same company as Queensboro PA, which was owned by Marian Nowakowski, a longtime friend of Chernov's. (Doc. 243-4, at 64). In fact, it was Chernov who first approached Nowakowski about doing the flooring work at Unit 298, over a year before the explosion occurred. (Doc. 244-4, at 16). Because Queensboro PA only sold flooring material in Pennsylvania and did not perform installation or finishing, Nowakowski gave Chernov Korytkowski's phone number. (Doc. 244-4, at 16). Korytkowski had previously worked for Nowakowski under a separate company Nowakowski once owned in New York. (Doc. 244-4, at 5). However, because Queensboro PA was a storefront without any service component for installation or refinishing, Nowakowski referred his customers to

Korytkowski and Queensboro Professional for those tasks.[5] (Doc. 244-4, at 8-10). Accordingly, Korytkowski was put in touch with Epelboym through Nowakowski and Chernov about a year before the explosion, and Queensboro Flooring performed its first job at Unit 298 at that time.[6] (Doc. 245-1, at 23).

The following year, Epelboym asked Korytkowski to refinish all three floors of Unit 298. (Doc. 245-1, at 23). After visiting to provide his estimate, Korytkowski returned to Unit 298 to and completed the top two floors of the condo with Epelboym and the Ukrainian workers present, and just before Epelboym left for Europe. (Doc. 245-1, at 23). Before leaving, Korytkowski told Epelboym that the basement level needed to be cleared for when he returned to finish the last floor. (Doc. 245-1, at 23-24). Epelboym then told the Ukrainian workers to "empty the basement" in anticipation of Korytkowski's return. (Doc. 244-3, at 27). Epelboym did not inform the Association about the flooring work on either occasion. (Doc. 243-4, at 60).

One of the items on the basement level of Unit 298 was a gas heater that Epelbyom claims had been there since Chernov purchased the property. (Doc. 243-4, at 45). The heater was always left on. (Doc. 243-4, at 53). The heater was attached to the gas source through a copper pipe that had a flexible attachment. (Doc. 243-4, at 55). This attachment allowed the heater to move approximately three feet in any direction. (Doc. 243-4, at 55-56). Epelboym claims that he inspected the heater before the previous winter and that all parts, including the

---

[5] Nowakowski was not concerned with distinguishing Queensboro PA from Queensboro Professional, or otherwise ensuring that customers knew he and Korytkowski owned two separate entities. (Doc. 244-4, at 10).

[6] Queensboro Professional and Queensboro PA are collectively referred to throughout this opinion as "the Queensboro entities."

shutoff valve, were in good working order. (Doc. 243-3, at 10-12). The heater was connected by a gas line to a propane take located three or four feet outside of Unit 298 on common property. (Doc. 243-4, at 42-43). The propane tanks were serviced by a private company. (Doc. 243-4, at 42). Despite the location of the tanks and gas line on common property, the Association took no steps to service or inspect the tanks, gas lines, or appliances connected to the tanks. (Doc. 243-4, at 42-43; Doc. 277-14, at 12). Epelboym stated that the proper way to disconnect the heater was by turning the shutoff valve and disconnecting both the union and the tank located outside. (Doc. 243-3, at 13). However, Epelboym never instructed his Ukrainian workers on how to safely disconnect the heater. (Doc. 243-3, at 31; Doc. 243-3, at 10). In spite of Korytkowski's instruction to remove everything from the basement, Epelboym never anticipated that the heater would need to be removed because of the flexible tubing that allowed it to be moved around up to three feet.  (Doc. 243-3, at 31). Because he did not instruct them to remove the heater, Epelboym asserts that the Ukrainian workers lacked authorization to remove the heater. (Doc. 243-3, at 16). After the explosion occurred, the Ukrainian workers allegedly told Epelboym that they never moved the heater. (Doc. 243-3, at 15; Doc. 243-4, at 61).

Korytkowski arrived back at Unit 298 on July 22, 2009, the day of the explosion. (Doc. 245-1, at 20). Korytkowski brought along Pozarlik, a part-time worker experienced with the installation and refinishing of hardwood floors, to complete the job. (Doc. 245-1, at 20, 49). When Korytkowski and Pozarlik arrived at Unit 298 that morning, the Ukrainians were working inside and outside the unit completing their touch-ups. (Doc. 245-1, at 21). As Korytkowski showed Pozarlik the upstairs floors that had already been completed, the Ukrainian workers removed the furniture and other items from the basement. (Doc. 245-1, at

21-24). At Pozarlik's request, and after Korytkowski had already instructed Epelboym that the basement needed to be cleared, Korytkowski specifically told the Ukrainian workers to unscrew the heater and take it outside. (Doc. 244-1, at 30-31). The Ukrainian workers then removed the heater while both  Korytkowski and Pozarlik were present in the room. (Doc. 244-1, at 31). Korytkowski and Pozarlik did not concern himself with whether or not the heater was disconnected properly because they did not consider it to be their responsibility. (Doc. 244-1, at 30-31, 37; Doc. 245-1, at 51). In his complaint, Pozarlik now alleges that the Ukrainian workers' unsafe removal of the heater without securing the gas line caused the explosion. (Doc. 194-5, at ¶ 18).

The parties dispute whether Pozarlik and/or Korytkowski smelled gas after the Ukrainian workers disconnected the heater. (Doc. 255, at 29-30; Doc. 276, at 87-88). Although the initial state police incident report stated that Pozarlik smelled gas (Doc. 258-2, at 6), Pozarlik was adamant in his deposition testimony that he did not smell anything.[7] (Doc. 244-2, at 24-26). Korytkowski left Unit 298 about an hour after he arrived to go check on another project at a different property, leaving Pozarlik to complete the flooring job in the basement. (Doc. 245-1, at 27). After a few hours of work, Pozarlik finished with the sanding and began to use his edger. Doc. 245-1, at 21).

---

[7] Pozarlik also presented deposition testimony from Katarzyna Kacprzak, who translated for Pozarlik during the state police interview. (Doc. 276-24). Kacprzak stated that Pozarlik never told her that he smelled gas while he was working at Unit 298, and that the state police report statement was likely due to a mistranslation because Pozarlik actually told the police that Korytkowski smelled gas at Unit 298 but did not inform Pozarlik of this until Pozarlik was in the hospital after the explosion. (Doc. 276-24, at 4-5).

Shortly after Pozarlik began edging on the afternoon of July 22, 2009, a spark from the edger likely combined with the gas in the room to create the explosion. (Doc. 244-2, at 32-33). As a result of the explosion, Pozarlik suffered severe burns to over seventy percent of his body, continues to suffer from pain, and has a limited range of motion in his elbows and lower extremities. (Doc. 194-5, at ¶¶ 21, 27). The Ukrainian workers were outside Unit 298 when the explosion occurred, either waiting for Pozarlik to finish the flooring before they painted the steps (according to Epelboym) (Doc. 243-4, at 62), or doing roofing and other repair work to the exterior of Unit 298 (according to the police report) (Doc. 258-2, at 7). None of the Ukrainian workers were seriously injured by the explosion. (Doc. 243-4, at 52). However, much of the interior and exterior structure of Unit 298 was largely destroyed. (Doc. 258-2, at 4-5).

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). In making this determination, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III.   DISCUSSION

All three parties move for summary judgment on the claims of negligence asserted against them. Because the case is before this Court as a diversity action pursuant to 28 U.S.C. § 1332, Pennsylvania substantive law applies. *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 474 (3d Cir. 2001). Under Pennsylvania law, there are four elements to establish liability in tort for negligence: "(1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff." *Farabaugh v. Pa. Tpk. Comm'n*, 911 A.2d 1264, 1272-73 (Pa. 2006).

### A.   BELLA CHERNOV

In her motion for summary judgment, Bella Chernov seeks dismissal of all negligence claims asserted against her. (Doc. 243). These claims include assertions set forth in: Pozarlik's

complaint (Doc. 194-5);[8] a third-party complaint filed by Queensboro Professional (Doc. 20); and the crossclaims filed by co-Defendants the Association and Simoncic (Doc. 35), Queensboro Professional (Doc. 38), and Queensboro PA (Doc. 93). These parties broadly allege three bases for imposing liability on Chernov: her status as the owner of Unit 298, the nature of her relationship with Epelboym, and negligent hiring. Each basis is addressed in turn.

### 1. Landowner Liability

The parties opposing summary judgment first argue that Chernov should be held liable in her capacity as the owner of Unit 298. (Doc. 269, at 6). "The standard of care a possessor of land owes to one who enters upon the land depends upon whether the person entering is a trespasser, licensee, or invitee." *Carrender v. Fitterer*, 469 A.2d 120, 123 (Pa. 1983). Here, Queensboro Professional and its employee, Pozarlik, each were Chernov's invitees because they were invited onto the property for a purpose connected with Chernov's business dealings, *i.e.*, to perform flooring work inside her Unit. Restatement (Second) of Torts § 332. "Possessors of land owe a duty to protect invitees from foreseeable harm." *Carrender*, 469 A.2d at 123. Accordingly, Chernov owed a general duty to protect Queensboro Professional and its employees from foreseeable harm.

Pennsylvania law also provides, however, that "the owner of real estate is not liable, except in limited circumstances, to persons injured through the negligence of an independent contractor to whom possession and control of the land was temporarily delivered." *Zinn v. Gichner Sys. Grp.*, 880 F. Supp. 311, 313 (M.D. Pa. 1995). The Supreme Court of Pennsylvania

---

[8] The Pozarliks asserted this claim as part of their second amended complaint in *Pozarlik v. Camelback Associates, Inc.*, No. 3:11-cv-1349, which was consolidated into this action.

recognizes several exceptions to this general rule, as found in the Restatement (Second) of Torts (the "Restatement"), including: "(1) Section 343, Dangerous Conditions Known To or Discoverable By Possessor; (2) Section 414, Negligence in Exercising Control Retained By Employer; and (3) Sections 416 and 427, collectively referred to as the Peculiar Risk Doctrine." *Farabaugh*, 911 A.2d at 1270. Chernov argues that she is not liable for injuries stemming from the explosion because she delivered temporary possession and control of the Unit to the contractors overseeing the repair work, presumably including her son. (Doc. 255, at 17-18). The parties opposing summary judgment, on the other hand, assert that both the "known dangerous condition" and "retained control" exceptions found in sections 343 and 414 of the Restatement apply to the case at bar. (Doc. 269, at 4-9).

### a.  Duty to Warn of Dangerous Conditions

Queensboro Professional argues that Chernov is liable under section 343 of the Restatement for failing to warn of a dangerous condition at Unit 298 in the form of "the presence of incompetent workers who Defendant Chernov knew or should have known would cause harm to persons and/or property." (Doc. 269, at 8-9). In support of its position that Chernov knew or should have known that the Ukrainian workers were incompetent and dangerous, Queensboro Professional notes that Chernov knew that those same Ukrainian workers had constructed the earlier deck addition that was condemned by a Monroe County Court of Common Pleas judge for failing to comply with applicable building codes, among other violations. (Doc. 248-2; Doc. 269, at 6).

A possessor of land has a duty to "use reasonable care to make the premises safe or give adequate and timely warning of dangers known to him but unknown to the contractor or his

employees." *Crane v. I. T. E. Circuit Breaker Co.*, 278 A.2d 362, 364 (Pa. 1971). Section 343

provides:

> A possessor of land is subject to liability for physical harm caused to his invitees
> by a condition on the land if, but only if, he
> (a) knows or by the exercise of reasonable care would discover the condition, and
> should realize that it involves an unreasonable risk of harm to such invitees, and
> (b) should expect that they will not discover or realize the danger, or will fail to
> protect themselves against it, and
> (c) fails to exercise reasonable care to protect them against the danger.
>
> Restatement (Second) of Torts § 343.

Pennsylvania courts that have examined similar claims under section 343 have held that

the duty to warn of "condition[s] on the land" does not encompass a duty to warn about

potential negligent or intentional acts of third persons. *T.A. v. Allen*, 669 A.2d 360, 364 (Pa.

Super. Ct. 1995); *see Rabutino v. Freedom State Realty Co.*, 809 A.2d 933, 938 n.4 (Pa. Super. Ct.

2002) (finding that claim against business owner for the failure to protect business invitees from

third persons on the business premises did not fall under section 343). Accordingly, the

Ukrainian workers cannot serve as a basis for the imposition of liability against Chernov under

section 343 because their presence does not constitute a condition on the land. Section 343 thus

is not a viable basis for the imposition of liability against Chernov in this case.

### b. Retained Control

The parties opposing summary judgment next assert that Chernov retained control over

the renovation process in a manner sufficient to preclude the general rule of possessor

nonliability for the negligence of an independent contractor. (Doc. 264, at 2-3; Doc. 269, at 6-

7). Chernov insists that she had nothing to do with the construction work and left the entire

project to her son, so thus is not subject to liability under section 414. (Doc. 255, at 17-18). On

the other hand, Queensboro PA asserts that section 414 applies because: (1) Chernov was the

lone defendant to the Monroe County Court of Common Pleas order that granted the Association injunctive relief and required Chernov to rebuild the deck in compliance with the applicable building codes and regulations (Doc. 248-2); (2) Chernov signed the building permits but failed to comply with their requirements regarding the verification of insurance of any contractors (Doc. 276-7, at 21-25); and (3) Chernov allegedly first spoke with Marian Nowakowski and requested the Queensboro entities to do the flooring work for Unit 298 (Doc. 244-4, at 16). (Doc. 264, at 2-4).

The Restatement imposes a duty of reasonable care on "one who entrusts work to an independent contractor, but who retains the control of any part of the work, [for injuries] to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414. Under section 414, "[t]here is . . . no appreciable difference in the 'retained control' analysis between a subcontractor's employee's negligence action against a landowner and one against a general contractor." *Warnick v. Home Depot U.S.A., Inc.*, 516 F. Supp. 2d 459, 471 (E.D. Pa. 2007). Although "[a]s a general proposition, the question of the quantum of retained control necessary to make the owner of the premises liable is a question for the jury," Pennsylvania "case law has construed this exception narrowly." *Beil v. Telesis Const., Inc.*, 11 A.3d 456, 467 (Pa. 2011).

Comment c to section 414 provides that general rule of possessor nonliability for the negligence of an independent contractor is precluded only if "[t]here [is] such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414, cmt. c. Here, Queensboro PA does not allege—and there is no evidence to suggest—that Chernov impeded Epelboym's ability "to do the work in his

own way." Restatement (Second) of Torts § 414, cmt. c. Furthermore, Queensboro PA provides no case law in support of its assertion that the Court of Common Pleas order, permit applications in Chernov's name, or conversation with Nowakowski could possibly serve as a basis for the imposition of liability under section 414. Because these alleged examples of Chernov's retained control are immaterial to determining whether Chernov influenced Epelboym's method of performing the work, Queensboro PA's attempt to impose liability on Chernov pursuant to section 414 must fail.

### 2. Agency

The parties opposing summary judgment next argue that Chernov is liable under the law of agency.[9] (Doc. 264, at 2-3; Doc. 269, at 5-6; Doc. 276, at 67-68). Section 1 of the Restatement (Second) of Agency defines "agency" as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). Under Pennsylvania law, "the three basic elements of agency are: 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" Basile v. H & R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000) (quoting Restatement (Second) of Agency § 1, cmt. b). Pennsylvania recognizes four methods of establishing an agency relationship: "(1) express authority, which is that which is directly granted; (2) implied

---

[9] In fact, comment a to section 414 explicitly contemplates that the law of agency provides a distinct ground for liability in an employer-contractor relationship. Restatement (Second) of Torts § 414, cmt. a.

authority, which is the right and obligation to do all that is proper, usual, and necessary to the exercise of authority actually granted; (3) apparent authority, which arises where the principal holds one out to be an agent by the principal's conduct; or (4) agency by estoppel." *Donegal Mut. Ins. Co. v. Grossman*, 195 F. Supp. 2d 657, 666 (M.D. Pa. 2001) (citing *Reifsnyder v. Dougherty*, 152 A. 98, 100 (Pa. 1930)). The existence of an agency relationship is generally a question of fact for a jury to determine. *Commonwealth v. One 1991 Cadillac Seville*, 853 A.2d 1093, 1096 (Pa. Commw. Ct. 2004).

Chernov does not dispute that she maintained an agency relationship with Epelboym, however, she argues that she is not liable for his negligent conduct because her relationship with Epelboym did not rise to that of master and servant. (Doc. 280, at 7-9); *see* Restatement (Second) of Agency § 2 (1958). An agency relationship becomes that of master and servant where the principal "controls or has the right to control the physical conduct of the other in the performance of the service." Restatement (Second) of Agency § 2(1). "Because a master has the right to exercise control over the physical activities of the servant within the time of service, he is vicariously liable for the servant's negligent acts committed within the scope of his employment . . . ." *Smalich v. Westfall*, 269 A.2d 476, 481 (Pa. 1970). However, "[s]ince an agent who is not a servant is not subject to any right of control by his principal over the details of his physical conduct, the responsibility rests upon the agent alone, and the principal is not liable, for harm caused by his unauthorized negligent physical conduct . . . ." *Smalich*, 269 A.2d at 481. Chernov argues that vicarious liability cannot be imposed on her because Epelboym controlled the methods of performing the construction work. (Doc. 280, at 7-9).

Despite Chernov's claims to the contrary, "[e]ven in circumstances where a master-servant relationship does not exist, an agency relationship may give rise to vicarious liability on

the part of the principal for the torts of the agent." *Stephenson v. Coll. Misericordia*, 376 F. Supp. 1324, 1329 (M.D. Pa. 1974). Specifically, section 250 of the Restatement (Second) of Agency provides:

> A principal is not liable for physical harm caused by the negligent physical conduct of a non-servant agent during the performance of the principal's business, if he neither intended nor authorized the result nor the manner of performance, unless he was under a duty to have the act performed with due care.
>
> Restatement (Second) of Agency § 250 (1958).

Here, even though Chernov did not control the manner of the day-to-day performance of the construction work so as to make the relationship between her and Epelboym one of master and servant, she both authorized the manner of performance and was under a duty to have the act performed with due care. Restatement (Second) of Agency § 250. In light of the Court of Common Pleas judgment ordering Chernov to have the deck torn down and rebuilt in compliance with the applicable building codes and regulations, Chernov had a duty to ensure that the work would be performed with due care.[10] (Doc. 248-2). Chernov may also be found to have authorized the manner of performance, given that she allowed Epelboym to use the same Ukrainian workers to rebuild the deck that had initially constructed it in violation of building codes and regulations.

---

[10] The analysis of section 250 of the Restatement (Second) of Agency differs from Queensboro PA's argument under section 414 of the Restatement (Second) of Torts in that Queensboro PA needed to show that Chernov actually retained control in a manner that made Epelboym "not entirely free to do the work in his own way." Restatement (Second) of Torts § 414, cmt. c. Section 250 does not require the principal to exercise the same level of actual control.

Comment b to section 250 notes that "the principal may be liable if he should know that there is an undue risk that the agent will be negligent and harm others, in which case his liability will be in accord with the rule stated in Section 213." Restatement (Second) of Agency § 250, cmt. b. Section 213 provides:

> A person conducting an activity through servants *or other agents* is subject to liability for harm resulting from his conduct if he is negligent or reckless:
> (a) in giving improper or ambiguous orders of in failing to make proper regulations; or
> (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others; or
> (c) in the supervision of the activity; or
> (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency § 213 (1958) (emphasis added).

Chernov has argued throughout this case that she cannot be liable for Epelboym's actions because she exercised virtually no control or supervision over his performance of the construction work. (Doc. 280, at 7-9). However, as noted by the Pozarliks, this lack of oversight—especially in light of the Court of Common Pleas order—is precisely why the imposition of liability on Chernov is appropriate under section 213. (Doc. 276, at 68). At the very latest, Chernov knew by the time the Court of Common Pleas order was entered that the Ukrainian workers were "improper persons" for carrying out the construction work because they lacked formal training and insurance, and because their work had resulted in the violation of several building codes and regulations. (Doc. 248-2). By this same rationale, Chernov also knew that Epelboym was unfit to be the de facto general contractor for the construction. *See* Restatement (Second) of Agency § 213, cmt. d ("The principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others

in view of the work or instrumentalities entrusted to him."). The parties opposing summary judgment have therefore produced enough evidence to establish that Chernov is vicariously liable for Epelboym's actions pursuant to Restatement (Second) of Agency sections 213 and 250, despite the fact that they did not have a master-servant relationship.[11]

### 3. Negligent Hiring

The final theory of liability asserted against Chernov is a claim of negligent hiring for selecting her son to act as the de facto general contractor.[12] (Doc. 269, at 7-8). As a general rule, "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." Restatement (Second) of Torts § 409. However, section 411 of the Restatement provides:

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor

---

[11] The nonmoving parties also assert that Chernov should be held vicariously liable for Epelboym's alleged negligence based on the theories of apparent authority and agency by estoppel. (Doc. 264, at 8-9; Doc. 269, at 5-6). "Apparent authority exists when a principal, by words or conduct, leads people with whom the alleged agent deals to believe the principal has granted the agent authority he or she purports to exercise." One 1991 Cadillac Seville, 853 A.2d at 1096. Under the theory of agency by estoppel, "the principal is bound by the acts of its agent because the principal has a duty under the circumstances to correct a third party's misapprehension that an agent is acting on its behalf and the principal has failed to satisfy that duty." Browne v. Maxfield, 663 F. Supp. 1193, 1199 (E.D. Pa. 1987). Here, however, because the Court finds and Chernov does not dispute that an actual agency relationship existed between Chernov and Epelboym, the Court need not consider these alternative theories of liability. See Restatement (Second) of Agency § 141 (1958) ("A principal, although not subject to liability because of principles of agency, may be liable to a third person on account of a transaction with an agent, because of the principles of estoppel, restitution or negotiability.").

[12] Although Epelboym argues that he did not explicitly assume the role of general contractor, he readily admits that he retained control over the work and performed the functions of a general contractor. (Doc. 243-3, at 4; Doc. 243-4, at 48).

(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or

(b) to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts § 411.

In her reply brief, Chernov counters that a negligent hiring claim must fail because none of the parties bringing claims against her are "third persons" within the meaning of section 411. (Doc. 280, at 13-15). State and federal courts within Pennsylvania interpret the "third persons" terminology as excluding employees who are involved in the work itself. *Fedor v. Van Note-Harvey Assocs.*, No. CIV.A. 10-5110, 2011 WL 1085993, at *4 (E.D. Pa. Mar. 18, 2011); *Holbrook v. Woodham,* No. 3:05–304, 2008 WL 4425606, at * 12 (W.D. Pa. Sep.30, 2008); *Mentzer v. Ognibene,* 597 A.2d 604, 607-09 (Pa. Super. Ct. 1991); *Dudash v. Palmyra Borough Auth.*, 483 A.2d 924, 928 (Pa. Super. Ct. 1984). This issue is discussed most extensively in *Mentzer v. Ognibene*, where a Superior Court of Pennsylvania panel held that section 411 liability applies only "to persons who are not involved in the construction project itself and yet who are injured as a result of the negligent act of the contractor." 597 A.2d at 608. The *Mentzer* court based its reasoning on three observations. First, the illustrations accompanying section 411 all reference injured customers and passersby but exclude instances where an employer/possessor of land would be liable for injuries to the employee of a contractor. *Mentzer*, 597 A.2d at 608. Second, comment f to section 411 states that an employer or possessor of land is potentially liable to "a person to whom the possessor owes a duty to exercise reasonable care to prepare and maintain a safe building." *Mentzer*, 597 A.2d at 608 (quoting Restatement (Second) of Torts § 411, cmt. f). However, because "Pennsylvania law imposes no general duty on property owners to prepare and maintain a safe building for the benefit of a contractor's employees who are working on that building," the *Mentzer* court surmised that comment f does not provide for a

- 23 -

contractor's injured employee to recover under section 411. *Mentzer*, 597 A.2d at 608. Finally, the *Mentzer* court determined that its construction of section 411 is based on sound policy grounds, because "section 411 should operate to protect those innocent third persons who are themselves unaware of and unable to protect themselves against the negligence of the improperly hired contractor," whereas other employees on the worksite are aware of the risks and more capable of protecting themselves. *Mentzer*, 597 A.2d at 609.

This Court finds the reasoning set forth in *Mentzer* to be persuasive.[13] Accordingly, any claim against Chernov asserting a theory of negligent hiring must be denied because none of the parties asserting this claim are "third persons" under section 411.

### 4. Conclusion

Chernov is not liable in tort in her capacity as a landowner under section 343, for the exercise of retained control over an independent contractor under section 414, or for negligent hiring under section 411. However, Chernov is vicariously liable for the torts committed by her son and agent, Dmitry Epelboym, pursuant to Restatement (Second) of Agency sections 213 and 250.

Accordingly, the Court denies Chernov's motion for summary judgment.

––––––––––––––––––––––

[13] In *Mentzer*, the plaintiff was employed directly by the negligently-hired contractor that caused his injuries, whereas in the case at bar Pozarlik was employed by Queensboro Professional but was allegedly injured by the Ukrainian workers. *Mentzer*, 597 A.2d at 606-07; (Doc. 270, at 7-8). However, the reasoning in *Mentzer* still applies because both Queensboro Professional and the Ukrainian workers were hired by Epelboym, the allegedly negligent contractor. Pozarlik thus does not qualify as a "third person" under section 411 regardless of the specific contractor on the worksite that caused his injury. *See, e.g., Dudash*, 483 A.2d at 928 (rejecting section 411 claim against municipal authority brought by subcontractor's employee for injuries caused by a different subcontractor because employee was not a "third person").

B.  DMITRY EPELBOYM

Epelboym is named as a Third-Party Defendant to the third-party complaint filed by Queensboro Professional and Tomasz Korytkowski on July 25, 2012 (Doc. 45), and also as a Cross-Claim Defendant to the crossclaims filed by Queensboro PA on May 17, 2013 (Doc. 91; Doc. 92; Doc. 93). Both Queensboro entities seek contribution from Epelboym for any liability they may have to the Pozarliks. In his motion for summary judgment, Epelboym contests these claims, arguing that the statute of limitations for any claims against him has lapsed and also that he is not liable as a joint tortfeasor. (Doc. 246).

**1.  Statute of Limitations Defense**

Epelboym first argues that he should be dismissed from the third-party action brought against him because neither Queensboro Professional nor Queensboro PA asserted claims against Epelboym until after Pennsylvania's two-year statute of limitations for negligence actions, 42 Pa. Cons. Stat. § 5524, had already lapsed. (Doc. 246, at 14-16). The explosion at 298 Overlook Way occurred on July 22, 2009, so to the extent that the explosion gave rise to a direct negligence action against Epelboym, the time to bring that action lapsed on July 22, 2011, over a year before the Queensboro entities initiated the third-party action and crossclaim. (Doc. 246, at 15).

However, Epelboym himself acknowledges in the brief in support of his motion for summary judgement that the two-year statute of limitations for negligence does not foreclose the right of contribution between joint tortfeasors. (Doc. 256, at 18). In its brief in opposition, Queensboro Professional reiterates this point and notes that under Pennsylvania law, the applicable limitations period to bring a contribution action is six years from the entry of judgment against the joint tortfeasors, as governed by 42 Pa. Cons. Stat. § 5527(b). (Doc. 270,

at 5-6); *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Nicholson Const. Co.*, 542 A.2d 123, 126 (Pa. Super. Ct. 1988) ("[I]n an action for contribution, the applicable limitation period is six years commencing from the entry of judgment against the joint tortfeasors."). Because judgment has not yet been entered in this case, the actions for contribution brought by the Queensboro entities are timely. *See* (Doc. 270, at 5-6). Epelboym appears to concede as much in his brief in support, as he does not challenge the timeliness of the actions for contribution against him.[14] (Doc. 256, at 18). Because Queensboro Professional and Queensboro PA raise claims for contribution rather than direct negligence claims, Epelboym's statute of limitations defense fails as it pertains to the third-party action and crossclaims.

### 2. Negligence Liability

In addition to his statute of limitations defense, Epelboym challenges the Queensboro entities' claims for contribution on the merits. The right of contribution "applies when a plaintiff and defendant are joint tortfeasors," and "comes into force when one joint tortfeasor has discharged a common liability or paid more than its share of such liability, in which case the joint tortfeasor is entitled to reimbursement from the other tortfeasors to the extent that its payment exceeded its own liability." *Kirschbaum v. WRGSB Assocs.*, 243 F.3d 145, 156 (3d Cir. 2001). Under Pennsylvania law, "joint tortfeasors" are defined as "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 42 Pa. Cons. Stat. § 8322.

---

[14] Epelboym chose not to file a reply brief.

Epelboym argues that he is not liable in tort for the explosion that caused Pozarlik's injury. Specifically, Epelboym contends that he breached no duty owed to Pozarlik. (Doc. 256, at 24). The Queensboro entities, on the other hand, allege several theories under which Epelboym could be liable in tort. These theories are based on the duties Epelboym assumed as the possessor of the property at 298 Overlook Way and for the retained control he exercised in directing the renovation work.[15] (Doc. 270, at 6-7). As a member of Chernov's household, Epelboym owed the same standard of care as Chernov. Restatement (Second) of Torts § 382 (1965). "The standard of care a possessor of land owes to one who enters upon the land depends upon whether the person entering is a trespasser, licensee, or invitee." *Carrender*, 469 A.2d at 123. Here, Queensboro Professional and its employees were invitees because they were invited onto the property by Epelboym for the business purpose of performing the flooring work. Restatement (Second) of Torts § 332. "Possessors of land owe a duty to protect invitees from foreseeable harm." *Carrender*, 469 A.2d at 123. Accordingly, Epelboym owed the same general duty as Chernov to protect Queensboro Professional and its employees from foreseeable harm.

As noted in regard to Chernov, Pennsylvania law provides that a possessor of land is generally not liable for the negligent acts of an independent contractor to whom possession and control of the land is temporarily delivered. *Zinn*, 880 F. Supp. at 313. However, Pennsylvania also recognizes the following exceptions to this general rule of possessor nonliability that are

---

[15] As discussed below, Epelboym's retained control over the work and performance of the functions of a general contractor is sufficient to impose a duty of reasonable care on him. (Doc. 243-3, at 4; Doc. 243-4, at 48).

found in the Restatement: "(1) Section 343, Dangerous Conditions Known To or Discoverable By Possessor; (2) Section 414, Negligence in Exercising Control Retained By Employer; and (3) Sections 416 and 427, collectively referred to as the Peculiar Risk Doctrine." *Farabaugh*, 911 A.2d at 1270. Epelboym argues that no exception to the general rule applies, and thus he did not breach any duty that could subject him to liability for an explosion that occurred on Queensboro Professional's watch. (Doc. 256, at 21-31). Conversely, the Queensboro entities assert that Epelboym is liable under sections 343 and 414 because he failed to warn of the presence of incompetent Ukrainian workers and/or the unsafely removed propane heater, and because he acted as the general contractor throughout the renovation process and therefore exercised control over the property. (Doc. 270, at 6). Additionally, the Queensboro entities raise a negligent hiring claim against Epelboym pursuant to section 411 of the Restatement. The Court therefore addresses each theory of liability in turn.

a.   Duty to Warn of Dangerous Conditions

The Queensboro entities claim that Epelboym is liable under section 343 of the Restatement for failing to warn of dangerous conditions on the property in the form of the allegedly incompetent Ukrainian workers and the propane heater that had not been safely removed. (Doc. 270, at 8-9). As noted in regard to the section 343 claim against Chernov, however, the presence of incompetent individuals is not a "condition on the land" under section 343. *Allen*, 669 A.2d at 364; *Rabutino*, 809 A.2d at 938 n.4. The presence of the heater is therefore the only potential ground for imposing liability on Epelboym under section 343. The section provides:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343.

In support of their argument that Epelboym knew or should have known that the heater presented a dangerous condition, the Queensboro entities point to deposition testimony from one of the Ukrainian workers, Michailo Nyshechey, who states that Epelboym told the Ukrainian workers "to empty the basement" in advance of Queensboro Professional's arrival. (Doc. 244-3, at 27). Because the propane heater was located in the basement, a jury could reasonably conclude that Epelboym's instruction implied that the Ukrainian workers were to remove the heater. Moreover, Epelboym states in his own deposition testimony that he did not instruct the Ukrainian workers how to safely disconnect the propane heater and shut off the gas line because he did not think they would need to move it. (Doc. 244-3, at 31). Drawing all inferences in favor of the non-moving parties, these factors combine to establish that Epelboym should have known that his instructions to the Ukrainian workers "to empty the basement," without telling them how to safely disconnect the propane heater, created an unreasonable risk of harm to Queensboro Professional and its employees that the heater would be improperly disconnected with the gas line left unsecured. *See* Restatement (Second) of Torts § 343(a). A jury could also conclude based on Epelbyom's actions that he failed to exercise reasonable care to protect Queensboro Professional and its employees from the likely danger that the propane heater would be unsafely disconnected. *See* Restatement (Second) of Torts § 343(c).

The final remaining requirement for the imposition of liability under section 343 is that Epelboym should have "expect[ed] that [the Queensboro entities and Pozarlik] w[ould] not

discover or realize the danger . . . ." Restatement (Second) of Torts § 343(b). Thus, "the employer of an independent contractor has no duty to warn the contractor or his employees of a condition that is at least as obvious to them as it is to him." *Colloi v. Phila. Elec. Co.*, 481 A.2d 616, 620 (Pa. Super. Ct. 1984). Epelboym makes this exact argument in the brief in support of his motion for summary judgment, claiming that the propane heater was an obvious danger and that he lacked superior knowledge of the potential danger that the heater would be improperly disconnected.[16] (Doc. 246, at 12; Doc. 256, at 32). In support of this assertion, Epelboym notes that Pozarlik was trained as a volunteer firefighter in Poland, and therefore presumably had some knowledge of propane gas and the danger presented by an unsecured gas line. (Doc. 256, at 32). However, Epelboym's arguments fail to address the crucial fact that he alone knew that the Ukrainian workers had not been instructed on how to safely disconnect the propane heater, and therefore the risk that the heater would be unsafely disconnected was far more obvious to Epelboym than it was to the Queensboro entities and Pozarlik. Accordingly, a jury could reasonably conclude that Epelboym should have exercised reasonable care to warn Queensboro Professional and Pozarlik of the danger, because he alone knew that the Ukrainian workers had not been trained on how to safely disconnect the heater.[17]

---

[16] *See* Restatement (Second) of Torts § 343A(1) ("A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.").

[17] Epelboym's statement regarding Pozarlik's training as a volunteer firefighter also pertains to Epelboym and Chernov's related argument that Pozarlik assumed the risk of injury. (Doc. 255, at 28-31; Doc. 256, at 32). Under Pennsylvania law, "[w]hen an invitee . . . discovers dangerous conditions which are both obvious and avoidable, and nevertheless proceeds voluntarily to encounter them, the doctrine of assumption of risk operates merely as a

Therefore, although the mere presence of unqualified Ukrainian workers does not constitute a dangerous condition under section 343 of the Restatement, summary judgment is precluded because of the Queensboro entities' claim that Epelboym failed to warn of the unreasonable risk of harm that the heater would not be removed safely by the Ukrainian workers.

### b. Retained Control

The Queensboro entities also assert that Epelboym retained control over the renovation process and acted as the de facto general contractor. (Doc. 270, at 6). In support of this contention, the Queensboro entities reference deposition testimony from numerous sources, including Chernov's indication in her deposition that Epelboym "was the boss. He's in charge." (Doc. 243-2, at 15). Epelboym himself corroborated his mother's statement, noting that he performed the functions of a general contractor. (Doc. 243-3, at 4; Doc. 243-4, at 48). In assuming this role, Epelboym instructed Queensboro Professional to do the flooring work, but

---

counterpart to the possessor's lack of duty to protect the invitee from those risks." *Carrender*, 469 A.2d at 125. However, "the question of assumption of the risk typically remains for the jury," as summary judgment is appropriate "[o]nly where the evidence reveals a scenario so clear as to void all questions of material fact concerning the plaintiff's own conduct . . . ." *Montagazzi v. Crisci*, 994 A.2d 626, 636 (Pa. Super. Ct. 2010). In this case, the evidence concerning Pozarlik's conduct is not nearly clear enough to void all questions of material fact. In addition to Pozarlik's training as a volunteer firefighter, Epelboym points to alleged inconsistencies in Pozarlik's testimony regarding whether or not he smelled gas prior to the explosion (Doc. 246-11, at 5; Doc. 246-12, at 5-6), and the fact that Pozarlik requested the propane heater be removed from the basement without ensuring that the heater was removed safely (Doc. 246-11, at 6-7; Doc. 246-12, at 4). This evidence may be sufficient to raise questions for a jury as to whether Pozarlik's actions constituted contributory negligence, but it is certainly not so clear as to warrant a finding as a matter of law that Pozarlik voluntarily encountered the risk that he would be injured by the heater explosion. Accordingly, Epelboym and Chernov's assumption of risk defense must fail at this summary judgment stage.

also hired the Ukrainian workers to do touch ups and various projects at Epelboym's direction. (Doc. 243-3, at 7; Doc. 243-4, at 30-34). However, Epelboym claims that he lacked sufficient control over the work that was ongoing when the explosion occurred to impose a duty because Epelboym had hired Queensboro Professional and Korytkowski as independent contractors to sand and refinish the floors. (Doc. 256, at 21-26).

The Restatement imposes a duty of reasonable care on an employer "who entrusts work to an independent contractor, but who retains the control of any part of the work, [for injuries] to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414. Under section 414, "[t]here is . . . no appreciable difference in the 'retained control' analysis between a subcontractor's employee's negligence action against a landowner and one against a general contractor." *Warnick v. Home Depot U.S.A., Inc.*, 516 F. Supp. 2d 459, 471 (E.D. Pa. 2007). Comment c to the Restatement further clarifies:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. . . . There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

> Restatement (Second) of Torts § 414, cmt. c.

Although "[a]s a general proposition, the question of the quantum of retained control necessary to make the owner of the premises liable is a question for the jury," Pennsylvania "case law has construed this exception narrowly." *Beil v. Telesis Const., Inc.*, 11 A.3d 456, 467 (Pa. 2011).

The facts in the case at bar are analogous to the facts presented in *Byrd v. Merwin*, 317 A.2d 280 (Pa. 1974). In *Byrd*, an electrical subcontractor's employee sued the landowner alleging liability under section 414 after the employee was injured when a prefabricated

staircase section was dropped on the employee's leg. *Byrd*, 317 A.2d at 281. The landowner hired and paid all subcontractors, and also instructed the electrical subcontractor when and where to begin work on the project. *Byrd*, 317 A.2d at 282. The Supreme Court of Pennsylvania found these facts sufficient to establish that the landowner retained a degree of control consistent with the imposition of liability under section 414. *Byrd*, 317 A.2d at 282. Furthermore, the Pennsylvania Supreme Court held that a jury could have reasonably concluded that the landowner was negligent in exercising control over the project, because: (1) he hired the worker that dropped the staircase section on the electrical subcontractor's employee; (2) that worker had been "clowning around" on the jobsite previously but was not removed from the jobsite; and (3) the landowner chose to have the electrical work started before completing the staircase installation. *Byrd*, 317 A.2d at 282.

As was the case in *Byrd*, Epelboym hired and paid both the Ukrainian workers and Queensboro Professional. (Doc. 243-3, at 7; Doc. 243-4, at 30-34). Additionally, Epelboym directed Queensboro Professional to commence the flooring job despite knowing that the Ukrainian workers were still working on the "touch ups" to the walls and deck. (Doc. 243-3, at 24-25, 35-36). Because Epelboym is alleged to have exercised the same degree of control as the landowner in *Byrd*, this Court concludes that Epelboym's actions are sufficient to impose liability under section 414. Furthermore, as with the landowner in *Byrd*, a jury could potentially find that Epelboym failed to exercise control with reasonable care. As noted above, Michailo Nyshechey stated in his deposition that Epelboym told the Ukrainian workers "to empty the basement" in advance of Queensboro Professional's arrival. (Doc. 244-3, at 27). Because the propane heater was located in the basement, a jury could reasonably conclude that Epelboym's instruction implied that the Ukrainian workers were to remove the heater, or at the very least

that the heater would need to be moved. *See* (Doc. 270, at 9). However, Epelboym states in his own deposition testimony that he never instructed the Ukrainian workers how to safely disconnect the propane heater and shut off the gas line because he did not think they would need to move it. (Doc. 244-3, at 31). Epelboym also employed the Ukrainian workers to perform the touch ups despite knowing that these same workers built the allegedly substandard deck addition that a Monroe County Court of Common Pleas judge ordered to be torn down. (Doc. 243-4, at 30-36). Based on this evidence, a reasonable jury could conclude that Epelboym acted negligently in directing the Ukrainian workers to do their touch ups at Unit 298 while Queensboro Professional performed the flooring job, particularly because Epelboym knew that the Ukrainian workers were untrained as to how to safely remove the heater.

As a defense, Epelboym claims that even if he retained control of the renovations in a manner sufficient to impose liability under section 414, he should not be held vicariously liable for the negligent acts of the Ukrainian workers because they were independent contractors acting outside the scope of their employment when they purportedly removed the propane heater. (Doc. 256, at 26-28). Under Pennsylvania law, "an employer is held vicariously liable for the negligent acts of his employee which cause injuries to a third party, provided that such acts were committed during the course of and within the scope of the employment." *Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998). "The determination of whether a person was acting within the scope of his employment is typically a question for the jury." *Costa*, 708 A.2d at 493.

Here, however, the deposition testimony of Michailo Nyshechey belies Epelboym's assertion that the Ukrainian workers acted outside the scope of their employment if they removed the propane heater, as Nyshechey stated that Epelboym "told us that we have to

empty the basement, because there would be people who would be coming to sand the floors." (Doc. 244-3, at 27). Given this evidence, a reasonable jury could conclude that the Ukrainian workers acted within the scope of their employment if they removed the propane heater from the basement, and so Epelbyom's vicarious liability argument therefore must fail.

Accordingly, Epelboym's motion for summary judgment is denied as it pertains to the Queensboro entities' "retained control" theory of liability.

### c. Negligent Hiring

The final theory of liability asserted by the Queensboro entities is a claim for negligent hiring. (Doc. 270, at 7-8). Epelboym does not challenge the substance of the Queensboro entities' negligent hiring claim in the brief in support of his motion for summary judgment. Nevertheless, the Court may determine whether this particular theory of liability fails as a matter of law. *See Mun. Revenue Serv., Inc. v. Xspand, Inc.*, 700 F. Supp. 2d 692, 703 n.19 (M.D. Pa. 2010) ("[I]n resolving a motion for summary judgment, the Court is not constrained to consider only those arguments interposed by counsel.").

As noted above in regard to the negligent hiring claim asserted against Chernov, section 411 of the Restatement limits liability to "physical harm to third persons . . . ." Restatement (Second) of Torts § 411. Pennsylvania courts interpret "third persons" as excluding employees who are involved in the work itself. *Fedor v. Van Note-Harvey Assocs.*, No. CIV.A. 10-5110, 2011 WL 1085993, at *4 (E.D. Pa. Mar. 18, 2011); *Holbrook v. Woodham,* No. 3:05–304, 2008 WL 4425606, at * 12 (W.D. Pa. Sep.30, 2008); *Mentzer v. Ognibene*, 597 A.2d 604, 607-09 (Pa. Super. Ct. 1991); *Dudash v. Palmyra Borough Auth.*, 483 A.2d 924, 928 (Pa. Super. Ct. 1984). Accordingly, because Pozarlik is not a "third person" within the meaning of section 411, Epelboym cannot be liable for a claim of negligent hiring.

### 3. Conclusion

Because Queensboro Professional and Queensboro PA only assert claims for contribution against Epelboym, those claims are governed by the six-year statute of limitations period set forth in 42 Pa. Cons. Stat. § 5527(b) and are therefore timely. Furthermore, although Epelboym is not liable in tort for negligent hiring under section 411 or for the supposedly dangerous condition created by the presence of the Ukrainian workers under section 343, the Queensboro entities have asserted potentially valid theories of liability under section 343 for the dangerous condition created by the presence of the propane heater that was not safely disconnected and removed and under section 414 for Epelboym's retained control over the project. Accordingly, the Court denies Epelboym's motion for summary judgment.

### C. THE ASSOCIATION AND KATHLEEN SIMONCIC

In their motion for summary judgment (Doc. 247), the Association and Kathleen Simoncic seek dismissal of the lone negligence claim that the Pozarliks assert against them (Doc. 194-5). The Association and Simoncic specifically contest the duty and causation elements of the Pozarliks' negligence claim.

### 1. Duty

The Association and Simoncic first contend that they owed no duty to the Pozarliks. (Doc. 257, at 15).

### a. The Law of Condominium

The Court's application of the duty analysis in this case is complicated by the relationship between condominium law and the law of tort. *See, e.g.*, *Smith v. King's Grant Condo.*, 614 A.2d 261, 263 (Pa. Super. Ct. 1992) ("The law of condominium is a relatively new area and is expanding rapidly. Unfortunately, the law of tort has yet to catch up with

developments in this area."), *aff'd*, 640 A.2d 1276 (Pa. 1994). This difficulty "arises from the innate duality of a condominium's nature; in some ways the condominium relationship is akin to that of adjacent owners, in others, it is like that of lessor and lessee." *Smith*, 614 A.2d at 264. A "condominium" is defined in 68 Pa. Cons. Stat. § 3103 as "[r]eal estate, portions of which are designated for separate ownership and the remainder of which is designated for common ownership solely by the owners of those portions. Real estate is not a condominium unless the undivided interests in the common elements are vested in the unit owners." In *Smith v. King's Grant Condominium*, a Pennsylvania Superior Court panel noted:

> [I]t is necessary to view the condominium association, and its *possession* of the common elements of the condominium, as an entity separate and apart from the [unit owner] and her *possession* of the individual unit, with each possessing definable, adjacent land interests. In fact, the statutory scheme in Pennsylvania directs that the individual unit owner be treated as a separate entity in tort . . . .
>
> 614 A.2d at 264-65.

Under Pennsylvania law, "liability for maintenance of premises" generally lies with the party that has "possession and control of the land." *Whitaker v. Hills*, 430 F. Supp. 1389, 1391 (E.D. Pa. 1977) (citing *Williams v. Wolf*, 84 A.2d 215, 216 (Pa. Super. Ct. 1951) ("As to third parties, liability for injuries rests upon the party who has possession and control of the area in which the injury occurred.")). "In order for the party to be liable, it must first be a 'possessor' of land." *Blackman v. Fed. Realty Inv. Trust*, 664 A.2d 139, 142 (Pa. Super. Ct. 1995). A "possessor" of land is defined in the Restatement as:

> (a) a person who is in occupation of the land with intent to control it or
> (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
> (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).
>
> Restatement (Second) of Torts § 328E (1965).

- 37 -

Because Epelboym and Chernov, rather than the Association, occupied Unit 298 with the intent to control it, the Association cannot ordinarily owe a duty of care with regard to conditions on land (*i.e.* Unit 298) that the Association does not actually possess.

Pozarlik nonetheless urges this Court to look beyond "the fact that Plaintiff was inside Unit 298 when the explosion occurred so as to arguably relieve [the Association] of liability," in favor of "the totality of the circumstances in this case . . . ." (Doc. 277, at 50). Specifically, Pozarlik alleges that the Association's "duty of care is derived from the Association's Declaration." (Doc. 277, at 51). Article VI.B of Declaration provides, in relevant part:

> The Declarant, its successors, or assigns, the Property Owners Association, and the Managing Agent, shall have a right of access to any part or parts of the property for the purpose of making inspections or for the purpose of correcting any condition likely to result in a breach of any protective covenants or for the purpose of abating, remedying or correcting such breach . . . , provided that requests for entry are made in advance and that any such entry shall be at a reasonably convenient time.

(Doc. 248-14, at 35).

The Association counters that Pozarlik, as a non-party to the Association's Declaration and Bylaws, cannot use those obligations to establish a duty. (Doc. 257, at 27-29). In support of this argument, the Association cites *Moranko v. Downs Racing LP*, a case in which a divided Pennsylvania Superior Court panel determined that a casino's internal policy of denying visibly intoxicated patrons access to the gaming floor did not place a duty on the casino valets to withhold automobiles from those same visibly intoxicated patrons. (Doc. 257, at 27-28 (citing 118 A.3d 1111, 1115 (Pa. Super. Ct. 2015)). However, the Association's reliance on *Moranko* appears to be misplaced. The Superior Court panel in *Moranko* reasoned that the policy did not place a duty on the casino because the aim of the policy did not encompass the conduct that plaintiff sought to impose a duty on the casino to prevent.

- 38 -

118 A.3d at 1115. In the case at bar, conversely, Pozarlik argues that the Association's "right of access to any part or parts of the property" to inspect for "any condition likely to result in a breach of any protective covenants," as found in the Declaration, encompasses the construction activity occurring at Unit 298 on the day of the explosion. (Doc. 277, at 51-53 (citing (Doc. 248-14, at 35)).

Furthermore, the fact that Pozarlik was not a party to the Declaration and Bylaws "is not an essential prerequisite to the existence of a duty, as the law may operate under certain circumstances to impose a duty in favor of a third party against one operating under a contract, without reference to the terms of that contract." *Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215, 1220 n.3 (Pa. 2003); *Harris v. Kellogg, Brown & Root Servs., Inc.*, 618 F. Supp. 2d 400, 429 n.27 (W.D. Pa. 2009) ("The Court notes that under Pennsylvania law a person need not be classified as a third-party beneficiary or be in privity of contract with one of the parties to a contract for a duty to be created by a contract between third parties."). Indeed, "where a party to a contract assumes a duty to the other party to the contract, and it is foreseeable that a breach of that duty will cause injury to some third person not a party to the contract, the contracting party owes a duty to all those falling within the foreseeable orbit of risk of harm." *Doyle v. S. Pittsburgh Water Co.*, 199 A.2d 875, 878 (Pa. 1964). Although a condominium declaration is technically not a contract, Pennsylvania courts apply the principles of contract law when examining these declarations.[18] *Country Classics at Morgan*

---

[18] Condominium declarations are generally drafted and adopted by the condominium association as "the perpetual governing instrument for the condominium . . . ." 68 Pa. Cons. Stat. Ann. § 3219, cmt. 1. As such, condominium declarations lack the contractual

*Hill Homeowners' Ass'n, Inc. v. Country Classics at Morgan Hill, LLC*, 780 F. Supp. 2d 367, 374 (E.D. Pa. 2011); *MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Assocs., L.P.*, 47 A.3d 137, 145 (Pa. Super. Ct. 2012). Here, because the Association assumed a duty under the Declaration to inspect for potential breaches of the covenants, including potential breaches inside the individual units, it was reasonably foreseeable that an invitee of a unit owner would be injured by the Association's failure to take reasonable steps to inspect the construction activity occurring at Unit 298.[19] Accordingly, Pozarlik may proceed under the theory that the Association owed him a duty of care under the terms of the Declaration as a foreseeable invitee of Chernov and Epelboym.

      b.   <u>Duty Standard</u>

"The existence of a duty is a question of law for the court to decide. In negligence cases, a duty consists of one party's obligation to conform to a particular standard of care for

---

requirements of mutual assent and the exchange of consideration. *MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Assocs., L.P.*, 47 A.3d 137, 144-45 (Pa. Super. Ct. 2012).

[19] In addition to a duty that arises through contract, a duty may also be assumed by a course of conduct. *Boyanoski ex rel. Estate of Kane v. Gould, Inc.*, 46 Pa. D. & C.4th 164, 172 (Pa. Ct. Com. Pl. 1999) (noting that Pennsylvania courts have adopted Restatement sections 323 and 324A). Section 323 provides that "[o]ne who undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts § 323 (1965). Section 324A extends a negligent actor's potential liability to third parties injured by the actor's failure to exercise reasonable care. Restatement (Second) of Torts § 324A (1965). Although Pozarlik does not explicitly cite either of these Restatement provisions, he does provide evidence that the Association, through its employees, undertook a duty to inspect and monitor the construction work conducted by the Ukrainian workers and negligently performed this duty. (Doc. 277, at 53 n.5). Thus, a duty could also be imposed on the Association due to its course of conduct.

the protection of another." *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005) (internal citations omitted). Although the parties disagree as to whether or not a duty was owed in this case, they do not dispute the factors that a court weighs in determining whether a duty arises in light of the circumstances described above. (Doc. 277, at 46; Doc. 281, at 7-8). Specifically, those factors include: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000).

     i.    Relationship Between the Parties

     In regard to the first factor, the Association contends that "the parties were essentially strangers to each other," while Pozarlik argues that he was either a business invitee or licensee of the Association. (Doc. 257, at 18-19; Doc. 277, at 50). The Court views the relationship between the parties as lying between these two poles. It is undisputed that Pozarlik was inside Unit 298 at the time of the explosion, which occurred from inside Unit 298. (Doc. 194-5, at ¶¶ 15, 19). Furthermore, as noted above, Unit 298 itself was possessed by Chernov and Epelboym, not the Association. *See* Restatement (Second) of Torts § 328E (1965); *Smith*, 614 A.2d at 264-65 ("[I]t is necessary to view the condominium association, and its *possession* of the common elements of the condominium, as an entity separate and apart from the appellant and her *possession* of the individual unit, with each possessing definable, adjacent land interests."). Because the Association did not possess the land on which Pozarlik was injured, it owed Pozarlik neither an invitee's nor a licensee's standard of care at the time of the explosion inside Unit 298. *See Heller v. Consol. Rail Corp.*, 576 F. Supp. 6, 13 (E.D. Pa. 1982) ("[T]he law imposes no duty upon a landowner to guard against allegedly dangerous conditions which exist on

adjoining property."), *aff'd*, 720 F.2d 662 (3d Cir. 1983) (table); *Jones v. Three Rivers Mgmt. Corp.,* 394 A.2d 546, 553 n.10 (Pa. 1978) ("Ordinarily, a lessor not in possession is not liable in trespass to invitees of his lessee.").

The fact that Pozarlik was not on land in the Association's possession when the explosion occurred, however, does not necessitate a finding that "the parties were essentially strangers to each other." (Doc. 257, at 18-19). Indeed, Simoncic states in her deposition testimony that Pozarlik and Korytkowski were admitted through the security gate and onto the condominium's common areas in making their way to Unit 298. (277-14, at 31-32). Because the Association's employee at the security gate voluntarily admitted Pozarlik and Korytkowski onto condominium property, they were licensees of the Association with respect to the common areas under the Association's possession. *See* Restatement (Second) of Torts § 330 (1965) ("A licensee is a person who is privileged to enter or remain on land only by virtue of the possessor's consent."). Moreover, Article I.13 of the Declaration defines "owner" as including not only "the owner of record of a Dwelling Unit," but also "his immediate family, his guests, and lessees." (Doc. 248-14, at 6-7). Based on this provision, the Court reasons that the Association has contemplated the inevitability that guests of the unit owners would be present in the condominium's common areas and individual units, and specifically chose to extend the rights and obligations of the Declaration to those guests. Accordingly, the Court concludes that the relationship between the parties is significant enough as to support the imposition of a duty.

    ii.    Social Utility of Defendants' Conduct

In regard to the second factor, the parties disagree as to how broadly the scope of the Association's conduct should be defined. (Doc. 257, at 19; Doc. 277, at 54). Because Pozarlik seeks to impose a duty of care derived from the Association's Declaration, the Court borrows

directly from the Article VI.B of the Declaration and defines the Association's conduct as "making inspections [and] correcting any condition likely to result in a breach of any protective covenants or for the purpose of abating, remedying or correcting such breach" on any part of the property, "provided that requests for entry are made in advance and that any such entry shall be at a reasonably convenient time." (Doc. 248-14, at 35). Regardless of how broadly the Association's conduct is defined, however, it is clear that any effort by the Association to inspect conditions that could result in a breach of the protective covenants carries significant social utility, as it serves to protect the safety and welfare of all other condominium owners and their property. Because of the inherent social utility in the Association's conduct, the second factor counsels against the imposition of a duty.[20]

  iii. Nature of the Risk and Foreseeability of the Harm

  The third factor is the nature of the risk imposed by a defendant's negligent performance of the conduct, as well as the foreseeability that harm would ensue. "The type of foreseeability that determines a duty of care, as opposed to proximate cause, is not dependent on the

---

[20] Both the Association and Pozarlik appear to interpret the second factor as gauging the social utility *of imposing a duty* on the actor's conduct, rather than the social utility of the conduct itself. (Doc. 257, at 19 ("[T]here is no such social utility in the . . . [A]ssociation involving itself with the sanding job inside unit 298."); Doc. 277, at 54 ("It would be difficult to argue that there is no social utility in requiring Defendants to supervise and inspect construction work being performed at a dwelling unit when they had notice and knowledge of the egregiously defective and unsafe work by the very same unqualified and uninsured owner and her workers at Unit 298.")). However, this Court's review of the relevant case law reveals that courts generally find that the second factor does not support the imposition of a duty where a defendant's conduct has indisputable social utility. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 395 F. Supp. 2d 183, 194 (M.D. Pa. 2005) (collecting cases), *aff'd*, 533 F.3d 162 (3d Cir. 2008); *Lindstrom v. City of Corry*, 763 A.2d 394, 397 (Pa. 2000) ("The second factor weighs against imposing a duty, as the social utility of a police officer's attempt to apprehend a person suspected of violating the law is beyond dispute.").

foreseeability of a specific event." *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1369 (3d Cir. 1993); *Suchomajcz v. Hummel Chem. Co., Newark, N.J.*, 524 F.2d 19, 29 n.8 (3d Cir. 1975) ("The concept of foreseeability means the likelihood of the occurrence of a general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury."). Here, substantial harm may result should the Association negligently perform its undertaking to inspect and correct "condition[s] likely to result in a breach of any protective covenants," particularly to the extent that unit owners and their guests may rely on the Association's oversight. (Doc. 248-14, at 35). Moreover, Pozarlik's injury falls within the scope of the general type of risk attendant to the Association's failure to inspect, as injuries to unit owners and their invitees is a foreseeable result of leaving a "condition likely to result in a breach of any protective covenants" uninspected and uncorrected. (Doc. 248-14, at 35). As noted above, the precise chain of events that caused those injuries to Pozarlik is not dispositive of the foreseeability analysis in the context of duty. The third factor thus favors the imposition of a duty on the Association.

     iv.    Consequences of Imposing a Duty on Defendants

In regard to the fourth factor, the Court is in agreement with the Association's contention that "[t]he consequences of imposing a duty would prove onerous." (Doc. 257, at 22 (quoting *Commerce Bank / Pa. v. First Union Nat. Bank*, 911 A.2d 133, 139 (Pa. Super. Ct. 2006)). Undoubtedly, it is a difficult undertaking for the Association to inspect for "condition[s] likely to result in a breach of any protective covenants," particularly to the extent that those conditions may arise inside an individual unit. (Doc. 248-14, at 35). Furthermore, it is unclear whether the Association itself or the individual unit owners are in the best position to monitor the potentially breaching conditions that arise inside the units, as the Association is better

equipped with the tools and maintenance staff needed to perform the task but the unit owners each possess and control of their own units.

Ultimately, however, the imposition of a duty on the Association is fair because the Association already agreed to perform this conduct under the terms of the Declaration. (Doc. 248-14, at 35). To the extent that the Association deems it untenable to inspect inside individual units for conditions that potentially may breach the covenants, it could have drafted the terms of the Declaration less ambiguously or sought to amend the Declaration.[21] Accordingly, the Court finds that the consequences of imposing a duty on the Association, although onerous, are just and therefore the fourth factor weighs in favor of Pozarlik.

v.    Public Interest in the Proposed Solution

The fifth and final factor is the overall public interest in the proposed solution. Here, the Court agrees with Pozarlik that there would be public interest in any solution that provides guests to the condominium with protection from the dangers associated with repair work and other conditions likely to result in breaches to the covenants. (Doc. 277, at 57). Beyond this, and in contrast to the Association's claim, the Court does not perceive a significant public interest in how the responsibility to inspect and correct "condition[s] likely to result in a breach of any protective covenants" should be allocated between a condo association and the individual unit orders. (Doc. 248-14, at 35; Doc. 257, at 19). Because the public interest favors

---

[21] As noted above, Pennsylvania courts routinely apply general principles of contract law when examining condominium declarations. *See Country Classics at Morgan Hill Homeowners' Ass'n, Inc.*, 780 F. Supp. 2d at 374 & n.45 (collecting cases). One such principle is "that where ambiguity clouds interpretation[,] the contract in controversy must be interpreted against its authors." *Sykes v. Nationwide Mut. Ins. Co.*, 198 A.2d 844, 845 (Pa. 1964).

holding the Association responsible for inspecting and correcting conditions that could breach the protective covenants and harm unit owners' guests, the fifth factor also supports the imposition of a duty.

Accordingly, based on the application of the relevant facts and legal principles of this case to the factors set forth in *Althaus*, the Court finds that the Association owed Pozarlik a duty of care.

### 2.  Causation

The Association also contends that it is entitled to summary judgment on the grounds that the Association's alleged breach of duty did not cause Pozarlik's injury. (Doc. 257, at 29-35). "[C]ausation is normally a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue." *Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1978); *Anderson v. Bushong Pontiac Co.*, 171 A.2d 771, 775 (Pa. 1961) ("[T]he question of proximate cause of an accident is almost always one of fact for the jury."). If "a plaintiff has established facts from which a jury could reasonably conclude that defendant's actions were a substantial factor in bringing about the harm, 'the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence.'" *Hamil*, 392 A.2d at 1285 (quoting *Carlson v. A. & P. Corrugated Box Corp.*, 72 A.2d 290, 293 (Pa. 1950)). "[I]n determining whether the actor's conduct is a substantial factor in bringing about harm," section 433 of the Restatement sets forth the following three considerations:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

- 46 -

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

(c) lapse of time.

Restatement (Second) of Torts § 433 (1965); *Vattimo v. Lower Bucks Hosp., Inc.*, 465 A.2d 1231, 1234 (Pa. 1983) (adopting section 433).

Furthermore, the Pennsylvania Supreme Court has previously considered cases, like the one at bar, that are based on theories that "the defendant's act or omission failed in a duty to protect against harm from another source," and distinguished them from the typical case where "a defendant's act or omission set in motion a force which resulted in harm . . . ." *Hamil*, 392 A.2d at 1286. The court concluded that because these cases involve the difficult task of weighing "whether the harm would have resulted from the independent source even if defendant had performed his service in a non-negligent manner," the cases should be permitted "to go to the jury upon a less than normal threshold of proof." *Hamil*, 392 A.2d at 1287-88. The court in *Hamil* reasoned that this lesser standard of proof follows directly from section 323(a) of the Restatement:

Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

*Hamil*, 392 A.2d at 1286 (citing Restatement (Second) of Torts § 323 (1965)).

Although section 323 cases and the *Hamil* standard are most commonly seen in the context of medical malpractice and wrongful death suits, section 323 also has been applied to cases involving the failure to inspect construction work and landlord liability. *Neal v. Bergland*, 646 F.2d 1178, 1184 (6th Cir. 1981) (holding that a federal agency, the Farmers Home Administration, could be held liable for negligence under section 323 where it voluntarily

undertook to inspect and supervise the construction of plaintiff's house but failed to identify numerous defects), *aff'd sub nom. Block v. Neal*, 460 U.S. 289 (1983); *cf. Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984) ("When a landlord by agreement or voluntarily offers a program to protect the premises, he must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, he is liable.").

Pozarlik's theory of liability is that the Association failed to inspect and monitor for "condition[s] likely to result in a breach of any protective covenants," which, if done correctly, would have minimized the likelihood that the Ukrainian workers would remove the propane heater in an unsafe manner. (Doc. 248-14, at 35). As noted above in regard to the duty analysis, the theory alleged by Pozarlik is grounded in Restatement section 323 and/or its counterpart, section 324A. Specifically, Pozarlik presents evidence that the Association assumed a duty under the Declaration to control and oversee the removal and reconstruction of the deck attached to Unit 298 "instead of allowing the same contractors who built the unsafe structure perform this work. (Doc. 277, 58).

Simoncic testified in her deposition that the Association was responsible for the replacement and maintenance of decks attached to units because they were located on common property. (Doc. 277-14, at 21). The Association's maintenance staff repairs and replaces decks by itself, but also allows unit owners to hire private contractors of their own choosing to do the work. (Doc. 277-14, at 22-23, 25-26). If a unit owner opts to hire a private contractor, Simoncic testified that the construction or repair plans must be approved by the Association's board, and if approved, the Association's maintenance staff inspects the work to ensure that it is done safely and in accordance with the approved plans. (Doc. 277-14, at 26-29). Although Chernov and Epelboym obtained board approval to demolish and rebuild the deck attached to Unit 298,

the maintenance staff found that the Ukrainian workers failed to adhere to the board-approved plan, and that the construction was unsafe and in violation of building regulations. (Doc. 277-14, at 30). Upon learning this, Pozarlik argues that the Association had a right and duty under Article V.G of the Declaration to either carry out the demolition and reconstruction of the deck itself or to hire a qualified outside contractor to do the work at Chernov's expense. (Doc. 248-14, at 24; Doc. 277, at 58). Not only did the Association permit the same Ukrainian workers to rebuild the deck, however, but it also failed to monitor the construction work to ensure that it did not create "condition[s] likely to result in a breach of any protective covenants . . . ." In fact, even on the day of the explosion maintenance department worker David Kalucki noted that he heard construction noises such as saws and hammering coming from Unit 298, but did not inspect or investigate. (Doc. 276-17, at 10).

The Court must apply the evidence laid out by Pozarlik to the considerations used to determine whether an actor's conduct is a substantial factor in bringing about harm. Restatement (Second) of Torts § 433. In regard to the first consideration, Pozarlik cites several other factors and allegedly negligent actors as contributing to his injuries. Nonetheless, few of these other factors had as much of an effect in producing the harm because they lacked the Association's knowledge of the Ukrainian workers' alleged incompetence and also lacked the authority to remove the Ukrainians from the worksite. Thus, on balance, the first consideration neither weighs in favor nor against a finding that the Association's conduct was a substantial factor in bringing about Pozarlik's injury. In regard to the second consideration, the Association's conduct arguably created a force that was in continuous operation up to the time of the harm, as the Association permitted the Ukrainian workers to rebuild the deck at Unit 298, and the Ukrainians were still there finishing up with painting the deck on the day of the

explosion. Accordingly, the second factor also reasonably supports a conclusion that the Association's conduct was a substantial factor in causing Pozarlik's injury. The final consideration is the lapse of time between a defendant's conduct and the injury. Here, it could be argued that the lapse in time was minimal because the Association neglected to perform its continuing duty to inspect the construction work. Even on the day of the explosion, a maintenance department worker could hear saws and hammering coming from Unit 298 but neglected to check on the source of the noise. (Doc. 276-17, at 10). The third consideration therefore also serves to support a finding that the Association's conduct constituted a substantial factor in bringing about the harm. Because a reasonable jury may differ on whether the Association's conduct was a "substantial factor" in producing Pozarlik's injuries, the question of causation is an appropriate issue for a jury to determine.

Beyond section 433, Pozarlik's tort claim against the Association rests on the even firmer ground of section 323. Section 323 requires one who undertakes to render services on behalf of another to act with due care, and imposes liability for harm proximately caused by the actor's failure to use due care. Under the rule elucidated in *Hamil*, a section 323 claim should go before a jury if a plaintiff can produce evidence that "a defendant's negligent act or omission increased the risk of harm . . . ." *Hamil*, 392 A.2d at 1286. In the case at bar, although it cannot be determined whether the explosion would have still occurred if the Association exercised due care, Pozarlik has produced sufficient evidence that the Association's negligence increased the risk of the explosion. The Association was well within its right under Article V.G of the Declaration to replace the Ukrainian workers with its own maintenance staff or a qualified outside contractor to carry out the demolition and reconstruction of the deck. (Doc. 248-14, at 24; Doc. 277, at 58). In failing to replace the Ukrainians with more qualified workers, the

Association undoubtedly increased the risk of harm. Even if the Association had opted for less drastic action, there would have been less risk of harm if the Association exercised due care to inspect the construction work. On the very day of the explosion, an Association maintenance department worker heard saws and hammering but did not bother to check on the noise. (Doc. 276-17, at 10). Although it is hardly certain that the maintenance worker would have detected that the heater was improperly disconnected and the gas line left unsecured if he had gone over to check on the noise, the Association's failure to inspect the construction activity certainly increased the risk of harm.

Accordingly, Pozarlik has made a sufficient evidentiary showing that the Association's negligence was a substantial factor in causing his injuries.

### 3.  Conclusion

Contrary to their assertions, the Association and Kathleen Simoncic owed a duty of care to Pozarlik derived from the Association's Declaration. Furthermore, Pozarlik has presented enough evidence to create a question for the jury to determine whether or not the Association's negligence was a substantial factor in bringing about Pozarlik's injuries.

Accordingly, the Court denies the Association and Simoncic's motion for summary judgment.

### IV.   CONCLUSION

For the foregoing reasons, the Court will **DENY** each party's motion for summary judgment. (Doc. 243; Doc. 246; Doc. 247).

An appropriate Order follows.

Dated: March 4, 2016

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**